UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                          ) | No. 2:11-cr-112-GZS |
| ) | |
| MARK DANIEL and KENNY DERAS, ) | |
| ) | |
| *Defendants* ) | |

*RECOMMENDED DECISION ON MOTIONS TO SUPPRESS*

Defendants Mark Daniel and Kenny Deras, each charged with conspiracy to use one or more counterfeit access devices, in violation of 18 U.S.C. §§ 371, 1029(b)(2), and 1029(c)(1)(A)(i), Indictment (Docket No. 1), have each filed a motion to suppress all physical evidence found in a Nissan Maxima which they occupied in the early morning hours of April 27, 2011, and any statements they made following the stop of that vehicle by Massachusetts State Police troopers. Motion to Suppress Evidence ("Daniel Motion") (Docket No. 25) at 1; Motion to Suppress Evidence ("Deras Motion") (Docket No. 36) at 1. I recommend that the court deny both motions.

An evidentiary hearing was held before me on January 4, 2012, at which the defendants appeared with counsel. The government presented four witnesses and offered ten exhibits, all of which were admitted, four of them over the objection of counsel for Deras and three of those four over the objection of counsel for Daniel. Defendant Daniel offered one exhibit, which was

admitted over objection. One joint exhibit was also admitted; it is a stipulation as to the testimony that would have been presented by a witness, Trooper Kevin Bibeau of the Massachusetts State Police. After both sides rested, counsel argued orally. I now recommend that the court adopt the following proposed findings of fact.

## I. Proposed Findings of Fact

Special Agent Matthew Fasulo of the Secret Service, who has been employed by that agency for 14 years, investigates financial crimes and currency violations out of the agency's Portland, Maine, office. On April 25, 2011, he met with Detective Pete Madore of the Biddeford Police Department, who informed Fasulo that someone had used counterfeit American Express credit cards at the Biddeford Wal-Mart to purchase gift cards. On April 26, 2011, American Express investigator Kathy Kerr called Fasulo and informed him that Biddeford police had arrested an individual who had attempted to use a counterfeit American Express card at the Biddeford Wal-Mart.

Fasulo called the Biddeford police and spoke with the arresting officer, who told him that Shaheem Shaw had been arrested while in possession of two counterfeit American Express cards. The arrest took place around 8:30 p.m. Fasulo went to the Biddeford police station and discussed what had happened with the arresting officers and Biddeford Detective Guy Godbout. He called Kerr, who confirmed that 12 attempts, some of which had been unsuccessful, had been made to make fraudulent charges on the cards found in Shaw's possession, all in New Hampshire or Maine.

Fasulo then viewed videotape from surveillance cameras at the Biddeford Wal-Mart, copies of which form Government Exhibit 1, showing a man wearing a dark suit, light shirt, and tie, getting out of a dark sedan in the store's parking lot and, from a different camera, entering

2

the store no more than 20 seconds later. The man entering the store is Shaheem Shaw; no other individual so dressed entered the store during the time between the man's exit from the car and Shaw's entrance into the store. It is not possible to tell the color of the sedan from the video, other than that it is dark.

While Shaw was in the store, the parking lot video shows a light vehicle arriving, and one or two people getting out of that vehicle, going to the side of the dark sedan from which Shaw had exited, and talking with someone inside the dark sedan, then returning to the light vehicle. About 25 minutes after arriving at the parking lot, the dark sedan left without Shaw, who had been arrested inside the store by that time.

Also in Shaw's possession when he was arrested were a Hampton Inn key which bore the legend "Welcome to New Hampshire," a cell phone, and other credit cards. When asked by Fasulo, Shaw said that he had been staying in a Hampton Inn that might be in New Hampshire, in Room 301, and that he remembered driving over a large bridge to get to the Biddeford Wal-Mart from the hotel. After waiving his Miranda rights,[1] Shaw told Fasulo that he had been picked up from his home in Brooklyn, New York, by a man he knew only as Calvin who was driving a black Nissan Maxima, who gave him the counterfeit credit cards, and who told him what to buy with the cards. He said that "a white guy" was also involved.

Fasulo did not believe everything that Shaw said, but he believed that Shaw had been staying in a Hampton Inn in New Hampshire, that one or more of his accomplices had driven away in the dark sedan, which was probably a Nissan Maxima, and that the hotel room number might be 301. Knowing that the Route I-95 corridor was usually the route for individuals engaging in credit card fraud to come into New Hampshire and Maine, Fasulo contacted Special Agent Brian Coffee of the Secret Service office in Manchester, New Hampshire, and asked him

---

[1] *Miranda v. Arizona*, 384 U.S. 486 (1966).

to locate Hampton Inns in the seacoast area of New Hampshire. He told Coffee that eventually he hoped to find a Hampton Inn that had rented a room to a group of as many as four black men for cash, the usual method of payment by individuals who hoped to conceal their identities, and/or a dark Nissan Maxima sedan or a white sedan with New York plates in the parking lot.

Fasulo also knew that Shaw's cell phone had rung more than once while he was in the Biddeford police station and that the calls were coming from a number with a Georgia area code.

After determining that there were Hampton Inns in Portsmouth and Dover, New Hampshire, Coffee spoke with representatives of the police departments in those municipalities and asked that they send officers to those Hampton Inns to look for the vehicles as described to him by Fasulo. The Portsmouth police reported no luck, but Officer Jason Feliciano of the Dover police reported that he had found a maroon Nissan Maxima with New Jersey plates in a parking lot of the Dover Hampton Inn.

Fasulo looked into the Maxima, which was parked alone at an odd angle near a side door to the hotel, and then went into the Hampton Inn and spoke with the desk clerk. He learned that Shaheem Shaw was not registered at the hotel, and asked the clerk to go through the records of cash rentals, which the hotel required be accompanied by a photocopy of the guest's driver's license. The clerk found a cash payment by Kenny Deras for Room 304 with a Georgia driver's license; the hotel registration card (Government Exhibit 6) showed that Deras had arrived in the Nissan Maxima.

Feliciano "ran" Deras's Georgia driver's license and learned that it was suspended. The license plate on the Maxima was issued to a rental agency. Feliciano then informed Coffee of what he had learned. Coffee asked Feliciano to maintain surveillance of the Maxima until Coffee could get to Dover. Feliciano parked behind the Hampton Inn with the lights of his

cruiser off in a position from which he could see the Maxima. At a time between midnight and 2 a.m., two black men came out of the Hampton Inn, put some boxes in the trunk and back seat of the Maxima, got into the car, and drove off. Feliciano advised Coffee that he was following the Maxima, which drove south on Central Avenue in Dover, stopped briefly at a 24-hour convenience store, and then headed south again to Stark Avenue and then Dover Point Road. Feliciano believed that the occupants were heading for the Spaulding Turnpike at Exit 6. He informed Coffee of this, and Coffee was able to take over following the Maxima onto the Spaulding Turnpike.

Fasulo, who was then driving from Biddeford toward New Hampshire, discussed with Coffee whether and where to pull the Maxima over. Fasulo also spoke with an assistant United States attorney in Maine while he was driving south, discussing the facts that gave him and Coffee reasonable articulable suspicion to stop the Maxima and probable cause to search the Maxima after it was stopped.

By this time – approximately 2 a.m. on April 27 – the Maxima was in Massachusetts, headed south on I-495. Coffee, who was driving an unmarked Jeep Durango and wearing plain clothes, contacted the Massachusetts State Police and asked them to effect the stop. This request was in accordance with the Secret Service's general policy of requesting assistance from local law enforcement when stopping suspect vehicles.

The Maxima was stopped in Chelmsford, Massachusetts, by Massachusetts State Trooper Bibeau. Massachusetts State Trooper Matthew Routhier arrived about two minutes later and saw Bibeau and Coffee talking to each other at the rear of the Maxima. There were two individuals in the Maxima. Fasulo arrived shortly after Routhier. It had started to rain shortly before the stop was made. One of the troopers told Coffee that Deras, the driver, had a suspended Georgia

5

driver's license and that the New York driver's license of the passenger, Mark Daniel, was also suspended. The car was rented in Shaw's name.

The defendants complied with a request that they get out of the Maxima. They were separated so that Coffee could talk with them individually. Routhier read Deras his Miranda rights at this time. Both defendants were very cooperative with the officers at all times. Deras told Coffee that he and Daniel had been to a funeral in Maine with friends who decided to fly home. Deras gave Coffee verbal permission to search the car and the trunk. Coffee asked separately for, and received, consent to search inside containers that were in the car. There were a number of bags in the back seat and in the trunk. Coffee saw two laptop computers, some i-Pods, and clothing still folded and taped as if for display in a store. The items he saw matched a list of items that had been purchased using fraudulent credit cards at Wal-Mart stores.

Neither Deras nor Daniel could be allowed to drive the Maxima because both had suspended licenses. It was raining hard, and the officers wanted to search the vehicle more carefully in a covered area. The defendants agreed to go to the Massachusetts State Police barracks in Concord; each defendant rode with one of the troopers. They were not handcuffed at any time. The Maxima was towed to the barracks, and Coffee followed it to the barracks.

At the barracks, each defendant was read and waived his Miranda rights before questioning. Both appeared to understand their rights. Coffee also obtained consent from Daniel for the search of the Maxima. During the search of the Maxima at the barracks, the officers found a number of cut-up counterfeit credit cards in the name of Shaheem Shaw, in a plastic bag in or behind the glove compartment, and several Wal-Mart gift cards.

At some point during the night, Daniel was allowed, at his request, to sleep in a cell to which the door remained open. Both defendants were eventually arrested and charged with state crimes in Massachusetts, apparently receiving stolen property and fraud.

The troopers would not have allowed the defendants to drive away after the stop, given their suspended licenses. Under those circumstances, the contents of the Maxima would have been inventoried, preferably before it was towed, but, if that was not possible, a trooper would follow the tow truck to the site where inventory could take place.

## II. Discussion

### A. Stopping the Maxima

Law enforcement officers may conduct a traffic stop when they have a "reasonable, articulable suspicion of an individual's involvement in some criminal activity." *United States v. Dunbar*, 553 F.3d 48, 55 (1st Cir. 2009). The suspicion need not arise from completely consistent information. *See, e.g., United States v. Coplin*, 463 F.3d 96, 101 (1st Cir. 2006). Reasonableness is judged according to objective criteria, which requires the court to consider the totality of the surrounding circumstances and to make a common sense determination that gives some deference to the perceptions of experienced officers. *Dunbar*, 553 F.3d at 55. When presumptively reliable information about criminal activity is provided by third parties, reasonable suspicion includes reasonable inferences that may be drawn when that information is viewed in light of the attendant circumstances. *United States v. Ruidíaz*, 529 F.3d 25, 29 (1st Cir. 2008).

Both defendants contend that the officers could not stop the Maxima unless they observed it engaging in a motor vehicle violation. Daniel Motion at 4 & n.3; Deras Motion at [3]. This is an incorrect statement of applicable law, as the large number of reported cases in

which a stop was initiated without evidence of a motor vehicle violation demonstrates. *See, e.g., United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008) (officer may stop a car if he has reasonable, articulable suspicion that car is carrying contraband). The authority cited by Daniel to support this assertion does not do so. *United States v. Chaney*, 584 F.3d 20, 24 (2009). That case arose from a traffic stop for operation without a working headlight. *Id*. at 22. It does not hold, or even discuss, that only a stop for a visible traffic violation meets the criterion of "reasonable, articulable suspicion" of criminal activity. Deras cites no authority at all. If the defendants' position were correct, individuals could commit crimes and, so long as they got into and stayed in their vehicles and committed no traffic violations, could lead law enforcement officers on a very long and unnecessary chase.

On the merits, the defendants' challenge to the stop of the Maxima must fail. By then, the officers knew that Shaw had arrived at the Biddeford Wal-Mart in a dark sedan, which he said was a Nissan Maxima; that he and those who had accompanied him had stayed in a Hampton Inn in New Hampshire, possibly in Room 301, before driving to Biddeford; that the Maxima's trip had originated in Brooklyn, New York; that Deras, a black man, had rented Room 304 in the Dover, New Hampshire, Hampton Inn, paying for the room with cash and indicating that he was traveling in a Nissan Maxima; that, a few hours after Shaw was arrested in Biddeford, at approximately 1:30 a.m., two black males came out of the Hampton Inn, loaded some medium-sized boxes into the Maxima, which the officers knew was a rental car, and then drove south; that it was common for people involved in credit card schemes to pay cash and to rent vehicles for use in the illegal activity; that Deras held a suspended Georgia driver's license and that Shaw's cell phone had been receiving calls from a number with a Georgia area code; and that Shaw had in his possession when arrested two counterfeit American Express cards that

8

had already been used to make fraudulent purchases in northern New England. This knowledge was sufficient to provide a reasonable, articulable suspicion that the Maxima was the car in which Shaw had been traveling and that the men in the car were involved in the use of fraudulent credit cards.

The inconsistencies in the evidence cited by counsel for the defendants are not sufficient to invalidate the officers' reasonable, articulable suspicion that the Maxima and its occupants were involved in criminal activity and that the Maxima was carrying contraband.

At oral argument, Daniel's attorney represented that all of his remaining arguments concerning suppression issued from the alleged illegality of the stop. Accordingly, my conclusion that there was no "poisonous tree" in the stop under the circumstances means that there is no "fruit" of that tree involved in any subsequent searches and statements made by Daniel, and his motion should be denied. Deras also takes nothing from his challenge to the stop of the Maxima.

### B. Removal of the Defendants from the Maxima

Because it is possible that his attorney's oral argument was not in fact intended to waive any arguments made in his motion, I next address Daniel's brief challenge to his "removal" from the Maxima after the stop. Daniel Motion at 5. He says that "[i]t remains unclear why the defendant, the front seat passenger in the Maxima, was removed from the car." He does not suggest why or how this "removal," if in fact it was not justified, renders inadmissible the subsequent search of the car and his statements made after he waived his *Miranda* rights.

The officers testified that the defendants got out of the Maxima willingly, in response to the officers' request. Even if Daniel had been forcibly "removed" from the car, a possibility completely without evidentiary support, any error caused thereby could only have been harmless,

9

because the evidence now establishes that Daniel's driver's license was suspended, so he would have had to get out of the Maxima at some point after the stop, because neither he nor Deras was legally able to drive it. This reasoning applies to Deras's similar claim. Deras Motion at [4]-[5].

### C. Search of the Maxima

Daniel concedes that any consent given to search the Maxima could "only be valid if the initial stop was proper." Daniel Motion at 6. He makes no other argument concerning the validity of the search of the car, so I need consider Daniel no further in this context.

Deras challenges the testimony of both Coffee and Routhier that he gave consent to search the Maxima before it was towed, apparently because "there is nothing in writing that memorializes such consent," he was "under arrest," he was "tired and it was late at night." Deras Motion at [4]. He asserts, without citation to authority or explanation of the fact's impact, that "[p]olice could have obtained a search warrant." *Id*. While the last assertion is true, it would clearly have been many hours after 2:30 a.m. before the officers involved could have obtained a search warrant. Deras cites no authority in support of any of his proffered reasons for why his consent to the search is alleged to have been invalid.

In any event, none of these assertions, to the extent that they may be inferred from the testimony at the hearing, invalidates the oral consent to search the Maxima which the officers credibly testified that they obtained from Deras. In addition, the evidence does not support a conclusion that Deras was under arrest at the time that he consented. Routhier testified directly to the contrary. Deras was not free to leave by driving away in the Maxima, but that was because he had been driving it with a suspended license. Routhier also testified that Deras went willingly to the barracks, was not handcuffed at any time, and was free to leave the barracks at

any time until he was arrested on the state-law charges. I find Routhier's uncontradicted testimony to be credible.

Oral consent to search is sufficient. *E.g., United States v. Lopez-Mendoza*, 601 F.3d 861, 866 n.2 (8th Cir. 2010). I have been unable to locate any case law holding that the fact that a defendant is tired, standing alone, invalidates his consent to a search. Finally, the fact that a search warrant could have been obtained is irrelevant, if the defendant's consent is obtained.

Deras is not entitled to suppression in general of the evidence found during the consent search of the Maxima.

### D. Search of Bags Inside the Maxima

Deras also challenges the search of bags inside the back seat and the trunk of the Maxima. Deras Motion at [5]-[6]. He asserts that Daniel lacked authority to consent to such a search because Deras was the driver of the car, the car was rented by Shaw, "[m]ost of the bags contained items that belong[ed] to Shaw," and police could have obtained a search warrant specific to the bags. *Id.*

As the government points out, Government's Objection to Defendant Mark Daniel's Motion to Suppress and to Defendant Kenny Deras's Motion to Suppress ("Opposition") (Docket No. 39), at 11-12, it is not necessary to address the question of consent to the search of any containers in the Maxima because the automobile exception justified this search. That is, the warrantless search of the contents of the Maxima was valid because the agents had probable cause to believe that the Maxima contained contraband or evidence of criminal activity, citing *United States v. Goncalves*, 642 F.3d 245, 249 (1st Cir. 2011).

The evidence discussed above meets the requirements of the automobile exception here. Even if that were not the case, Coffee testified that Deras consented to the search of the car and

separately to the search of the trunk and the search of the contents of any containers inside the car. I find that testimony credible. On this basis alone, Deras's challenge must fail. I also note, however, that Deras has no standing to challenge the search of what he now contends were Shaw's bags, because he had no legitimate expectation of privacy in those bags. *United States v. Brown*, No. CRIM. 05-70-P-S, 2006 WL 149031, at *6 (D. Me. Jan. 17, 2006). The burden rests with the defendant to show such an expectation. *United States v. Mancini*, 8 F.3d 104, 107 (1st Cir. 1993). Deras has made no attempt to do so, and it does not appear that he could have done so in any event.

Deras is not entitled to suppression of any evidence on the basis of this argument.

### E. Defendants' Statements

Deras agrees with Daniel that their motion to suppress the statements they made in the early hours of April 27, 2011, depend on a finding that the stop of the Maxima was illegal, rendering the statements they later made, having waived their *Miranda* rights, "fruit of the poisonous tree." Deras Motion at [6]. I have concluded that the stop of the Maxima was legally justified, and any arguments based on a finding to the contrary must accordingly fail.

### III. Conclusion

For the foregoing reasons, I recommend that the defendants' motions to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de</u> <u>novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

***Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.***

Dated this 17th day of January, 2012.

                                                                       /s/ John H. Rich III
                                                                       John H. Rich III
                                                                       United States Magistrate Judge